# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HERBERT BLACKMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 10 C 251 |
| ) | |
| CITY OF CHICAGO, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Herbert Blackmon ("Blackmon"), an African-American male, alleges that Defendant City of Chicago ("the City") violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981"). A former probationary building inspector with the Department of Buildings ("DOB"), Blackmon alleges that his supervisors (1) discriminated against him because of his race and color by criticizing his performance, increasing his workload, denying him sufficient training, and eventually terminating his employment, and (2) retaliated against him after he complained about a co-worker's comments by transferring him to another division and later terminating his employment. The City has moved for summary judgment on all claims, arguing that Blackmon lacks evidence to prove his claims. For the following reasons, the motion is granted.

## PROCEDURAL HISTORY

On October 27, 2008, Blackmon filed a charge with the Illinois Department of Human Rights ("IDHR") and alleged race discrimination and retaliation in violation of Title VII. (Pl.'s Am. Compl. ¶ 7.1(i); Charge of Discrimination, Attach. to Pl.'s Am. Compl.) After receiving a notice of his right to sue, on January 14, 2010, Blackmon filed a *pro se* complaint, alleging discrimination based on race and color, and retaliation under Title VII.[1] Blackmon's original lawsuit named, as Defendants,

---

[1] Blackmon filed an amended complaint on April 2, 2010.

the City's Department of Buildings ("DOB"); Deputy Building Commissioner James Harney; Bill Bugajski, a DOB assistant director; Tom O'Donnell, a supervising building construction inspector; and Labor Relations Supervisor Scott Loeff. (Pl.'s Am. Compl. ¶ 14.) Claims against the individual Defendants were dismissed on motion, and the City now moves for summary judgment. (Def. City of Chicago's Mot. for Summ. J. (hereinafter "Def.'s Mot."), at 1.)

## **FACTUAL BACKGROUND**

This Factual Background comes from Defendant's Local Rule 56.1(a) Statement of Undisputed Material Facts. Defendant complied with Local Rule 56.2 by providing notice to Plaintiff explaining FED. R. CIV. P. 56 and warning that a failure to respond properly could result in a judgment against him. N.D. ILL. LOCAL RULE 56.2. Plaintiff responded by filing a response memo, a 56.1(a) statement, and a response to Defendant's 56.1(a) statement.

Blackmon became a probationary building construction inspector with the DOB on March 17, 2008. (Def.'s Local Rule 56.1(a) Statement of Undisputed Material Facts (hereinafter "Def.'s 56.1(a)") ¶ 3.) During his six-month probationary period, Blackmon was employed at will and was subject to discharge as exclusively determined by the City. (*Id.* at ¶¶ 3, 13; City of Chicago Personnel Rule IX, Ex. 11 to Def.'s 56.1(a).) He received general orientation at the DOB for approximately two weeks before he was assigned to the demolition division. (Def.'s 56.1(a) ¶¶ 14-15.) Blackmon had worked as an inspector before, but he was not employed when he applied for this job. (Blackmon Dep., Ex. 3 to Def.'s 56.1(a), at 17.)

The parties have not described the work of the demolition division in great detail, but the court understands that the division responds to complaints from the public regarding vacant and open buildings. *Information on Demolition Process*, City of Chicago, http://www.cityofchicago.org /city/en/depts/bldgs/supp_info/information_on_thedemolitionprocess.html (last visited July 6, 2011). If a building is abandoned or criminal activity is occurring there, it is referred to the circuit court system. *Id.* The court may order the building to be properly secured or ultimately demolished. *Id.*

In the demolition division, Blackmon was responsible for inspecting properties to assess their condition, recording whether the properties were vacant and open or secured, and recording any building code violations. (Def.'s 56.1(a) ¶ 17.) Blackmon received on-the-job training, which involved shadowing other building inspectors in the field for two to three weeks. (*Id.*) Following his training, Blackmon's daily routine at work involved completing paperwork at DOB headquarters in the morning and conducting inspections in the afternoon. (*Id.* at ¶ 18.)

Blackmon and his co-workers in the demolition division shared a communal workspace and computer terminals where they completed their paperwork in the morning. (*Id.* at ¶ 19.) Although the inspectors were not assigned to specific work stations, some of those inspectors who had worked there for a long time would sit at the same work station every day and often displayed personal items in their stations. (*Id.*) According to Blackmon, there were approximately 14 inspectors, but only 10 computer terminals, which meant that sometimes inspectors had to wait to use a computer. (*Id.*) Blackmon testified that white and African-American inspectors sat on one side of the workspace, which was divided by a partition, and white and Hispanic inspectors sat on the other side of the workspace. (*Id.* at ¶ 20; Blackmon Dep. at 112.) The City does not dispute or explain this *de facto* segregated seating arrangement, other than to note it was Blackmon's "opinion" that the communal workspace was racially divided. (Def.'s 56.1(a) ¶ 20.)

In May 2008, Blackmon was looking for a computer terminal and saw an open seat beside Nick Covello (who is white), a seat ordinarily occupied by Rich Nowak.[2] (*Id.* at ¶ 22.) Blackmon asked Covello whether anyone was sitting in the open seat, and Covello replied, "It's all yours." (*Id.*) After Blackmon sat down to do his work, Tony Burmistrz (who is white) said, "Herb, if I was you, I would move back over to the other side." (*Id.* at ¶ 24.) Blackmon replied, "Why don't you move over there to the other side." (*Id.*) Burmistrz replied, "They don't like me over there." (*Id.*)

---

[2] The record does not identify Rich Nowak's race.

Although Burmistrz did not mention race during this exchange, Blackmon testified he believed Burmistrz's comments were motivated by race because: (1) Burmistrz is white and Blackmon is African-American, (2) Blackmon had sat down on the side of the partition primarily used by white and Hispanic inspectors, and (3) there was no reason for Burmistrz to suggest Blackmon move. (*Id.* at ¶ 25; Blackmon Dep. at 94, 110.)

Burmistrz's comments upset Blackmon, and he left to report what had happened to Shirley Seymore, an employee in the DOB's personnel division. (*Id.* at ¶¶ 26-27.) According to Blackmon, after he described the incident to Seymore, Seymore brought Marlene Hopkins, the Managing Deputy Commissioner, to speak with Blackmon in a hallway near Seymore's office. (*Id.* at ¶¶ 28, 29.) Blackmon told Hopkins: "I'm tired of this racial crap, I'm getting too old for this." (*Id.* ¶ 29, Blackmon Dep. at 104.) Hopkins told Blackmon that she could either talk to Burmistrz or transfer Blackmon to another division, and Blackmon chose the latter option. (Def.'s 56.1(a) ¶ 30.) Hopkins informed Deputy Building Commissioner Harney about Blackmon's complaint, and Harney decided to re-assign an employee from the Strategic Task Force ("STF") division to the demolition division and re-assign Blackmon from demolition to STF. (Harney Aff. ¶¶ 4, 7.)

A few days later, Blackmon met with Tom O'Donnell, supervising building construction inspector; Bill Bugajski, assistant director; and Don Mitchell, demolition supervisor, to discuss Blackmon's transfer to the STF division. (Def.'s 56.1(a) ¶ 34.) They offered Blackmon the position, and he accepted. (*Id.*) Blackmon's job title, salary, and benefits did not change after his transfer. (*Id.* at ¶ 35.)

STF works closely with the Department of Law and the Chicago Police Department, which refers troubled buildings and properties where criminal activity is occurring to the DOB for prosecution of City building code violations. (O'Donnell Aff. ¶ 2.) Within this division, the STF court team, which consists of three inspectors, is responsible for inspecting properties that are the subject of circuit court cases and testifying at a twice-weekly court call. (*Id.*)

Blackmon began his work as a probationary building inspector on the STF court team in May 2008. (Def.'s 56.1(a) ¶¶ 35, 39.) His job duties including inspecting properties, recording building code violations, and providing testimony in court cases brought by the City regarding building code violations where criminal activity was taking place. (*Id.* at ¶ 36.) After his transfer, Blackmon received training in the field from O'Donnell for approximately two to three weeks and went to court with O'Donnell to observe courtroom testimony for approximately two weeks. (*Id.* at ¶ 37; O'Donnell Aff. ¶ 7.) Although he acknowledges receiving this training, Blackmon nevertheless contends he was denied assistance and sufficient training. (Pl.'s Am. Compl. ¶¶ 31, 33-34; Blackmon Dep. at 153, 154.) Blackmon testified that he later asked for O'Donnell's help with an assignment and O'Donnell did not respond.[3] (Blackmon Dep. at 213.)

After Blackmon's training period ended in June 2008, O'Donnell began observing that Blackmon had performance problems, including: (1) substandard courtroom testimony, (2) difficulty identifying porch and building violations, (3) difficulty preparing violation notices, (4) failure to prepare amendments when additional violations were observed, (5) demonstrating a timid street presence, and (6) failing to use his time wisely. (Def.'s 56.1(a) ¶ 40.) Blackmon denies these observations and asserts that Bugajski excessively scrutinized his work performance. (Pl.'s Resp. to Def.'s Local Rule 56.1(a) Statement of Undisputed Material Facts (hereinafter "Pl.'s Resp.") ¶ 40.)

Also in June 2008, Assistant Director Bugajski received complaints from Judith Dever, senior corporation counsel at the City's Department of Law, regarding Blackmon's courtroom testimony. (Def.'s 56.1(a) ¶ 41.) Specifically, Dever reported that City prosecutors were dissatisfied with Blackmon's courtroom testimony because he could not remember details of inspections he had completed. (*Id.*) Bugajski also received similar complaints from Stephen McKenzie, senior counsel

---

[3] Blackmon believes this incident occurred during July 2008. (Blackmon Aff. ¶ 35.)

5

with the City's Department of Law. (*Id.*) Blackmon testified that one time Dever asked him "in passing," about a specific property, which he had inspected a few days before, but Blackmon could not recall details concerning the property at that time.[4] (*Id.* at ¶ 42; Blackmon Dep. at 156, 157.) Blackmon also received an e-mail message on August 27, 2008, from McKenzie (copies of which were directed to O'Donnell and Bugajski), stating that Blackmon owed him documentation relating to a certain property. (Def.'s 56.1(a) ¶ 42; E-mail from McKenzie to Blackmon, Ex. Q to Pl.'s Local Rule 56.1(a) Statement of Undisputed Material Facts (hereinafter "Pl.'s 56.1(a)").)

In June 2008, Bugajski met with Blackmon to discuss the City attorneys' dissatisfaction with Blackmon's courtroom testimony.[5] (Def.'s 56.1(a) ¶ 43.) At this meeting, according to Blackmon, Bugajski yelled and cursed at him about not remembering properties and said, "Damn it, or damn, you better remember [these properties]." (*Id.*; Blackmon Dep. at 207.) Although race was not mentioned during the conversation, Blackmon believes he was being harassed because of his race. (Def.'s 56.1(a) ¶ 43; Blackmon Dep. at 206.)

From June 2008 to August 2008, O'Donnell and Bugajski discussed Blackmon's poor work performance with each other. (Def.'s 56.1(a) ¶ 44.) Blackmon's supervisors believed his work performance did not show signs of improvement. (*Id.* at ¶¶ 44, 47, 49-50.) In one instance, O'Donnell saw Blackmon using his DOB computer to listen to music and told him to "cut it off." (*Id.* at ¶ 45.) In August 2008, O'Donnell met with Blackmon and told Blackmon that he was "mismanaging his time." (*Id.* at ¶ 46.) Blackmon insists, however, that his performance issues were not explained to him or documented. (Pl.'s 56.1(a) ¶¶ 13-15, 22-23, 25.) Blackmon admits that

---

[4] The record is unclear as to the date of this conversation and what exactly Dever asked Blackmon. It does not appear that this conversation related to Dever's concerns about his courtroom testimony. Blackmon alleges that this incident occurred during or around his training period. (Pl.'s Resp. ¶ 40.)

[5] The record is unclear as to the exact date of this meeting, but it might have been June 26, 2008. (Blackmon Aff. [Doc. 72-1] ¶¶ 7, 8.)

O'Donnell told him on two separate occasions that he was mismanaging his time, but asserts that O'Donnell refused to explain what he meant by that. (Pl.'s Resp. ¶ 46.)

Blackmon contends, further, that his workload increased during this time. (Pl.'s Am. Compl. ¶ 31.) Specifically, he testified that Bugajski required Blackmon to make copies of code violation notices to hand out to attorneys, which had not previously been one of ordinary duties. (Def.'s 56.1(a) ¶ 53; Blackmon Dep. at 257.) Blackmon also contends that Deputy Commissioner Harney followed him to court on September 9, 2008. (Pl.'s Am. Compl. ¶ 31; Blackmon Aff. ¶ 36.) Blackmon saw Harney in court speaking to another STF inspector, but did not know why Harney was there. (Def.'s 56.1(a) ¶ 54.) Blackmon believes that Harney was watching him. (Pl.'s Resp. ¶ 54.) Blackmon also believes that O'Donnell was watching him when he was in the field conducting inspections. (Def.'s 56.1(a) ¶ 53; Blackmon Dep. at 275.)

On September 5, 2008, Supervising Inspector O'Donnell drafted an e-mail message to Harney, Loeff, and Bugajski that stated, among other things, "Blackmon is incapable of performing the duties required of an STF team member." (E-mail from O'Donnell to Loeff, Ex. G to Bugajski Dep.) Harney recommended to Richard Monocchio, the acting Building Commissioner, that Blackmon's probationary employment be terminated, based on Blackmon's poor job performance and lack of improvement. (Def.'s 56.1(a) ¶ 50.) (As deputy commissioner, Harney had the power to recommend the termination of employees within the divisions he oversaw, but only Monocchio, as commissioner, had authority to actually hire or fire DOB employees. (*Id.* at ¶ 8.)) Monocchio terminated Blackmon's employment effective September 12, 2008. (*Id.* at ¶ 50.)

Blackmon contends that there is a pattern of discrimination at the DOB. (*Id.* at ¶ 57.) Blackmon testified that: (1) an African-American building inspector told him he would not learn as much in the demolition division as in the conservation division, (2) an unnamed "Arab" man once told him "something on the lines of minorities being around or in that department or something on those lines and not being there very long or something," and (3) following Blackmon's complaint to

7

Shirley Seymore in the personnel division, Seymore made a comment to Blackmon referring to his supervisors as "bad boys." (*Id.* ¶¶ 58-60; Blackmon Dep. at 69; 300-02; 314-318.) Blackmon also testified that when Blackmon told Seymore about the incident with Burmistrz, Seymore "sighed," though she did not say why. (Def.'s 56.1(a) ¶ 61; Blackmon Dep. at 345-46.) Seymore herself and Managing Deputy Commissioner Marlene Hopkins, however, who are both African-American and have worked at the DOB for 39 and three years respectively, testified that they never experienced racial discrimination during their employment there. (*Id.* at ¶ 62; Seymore Dep., Ex. 10 to Def.'s 56.1(a), at 28; Hopkins Dep., Ex. 8 to Def.'s 56.1(a) at 39.)

## DISCUSSION

The court will grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, the court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors," however. *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). The Seventh Circuit refers to summary judgment as the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quotation and citation omitted). It has also been recognized that "[d]iscrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives." *Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

### A. Title VII

Plaintiff alleges race and color discrimination, and retaliation in violation of Title VII. Specifically, Plaintiff alleges he was discriminated against when: (1) his probationary employment was terminated, (2) he was yelled at by Bugajski in June 2008, (3) he faced increased scrutiny and

an increased workload from O'Donnell and Bugajski, (4) Harney followed him to court, (5) his performance was criticized by O'Donnell and Bugajski, and (6) he was denied assistance and sufficient training. (Pl.'s Am. Compl. ¶¶ 12, 31, 33-34, 37; Def.'s 56.1(a) ¶¶ 51-56.) Plaintiff also alleges the City retaliated against him after he complained about Burmistrz's comments to him in the communal workspace by laterally transferring him to another division and eventually terminating his employment. (Def.'s 56.1(a) ¶ 5.) In response, Defendant argues that Plaintiff's discrimination and retaliation claims fail as a matter of law under both the direct and indirect methods of proof. (Def.'s Mot. ¶¶ 3-4.)

### 1. Race and Color Discrimination

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e)-2(a)(1). Plaintiff may prove his case of race and color discrimination by either the direct or the indirect method, *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006), and the court will consider Plaintiff's claims under each method.

#### a. Direct Method

Under the direct method of proof, Plaintiff proceeds by presenting evidence that he: (1) is a member of a protected class, and (2) suffered an adverse employment action as a result. *Id.* Plaintiff, an African-American, is a member of a protected class, and he suffered an adverse employment action when Defendant terminated his probationary employment. (Pl.'s Am. Compl. ¶¶ 13, 37.)

A materially adverse employment action is a "'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008), *quoting Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000) (concluding that an

employee denied the opportunity to visit clients and receive a resulting salary increase suffered an adverse action). Plaintiff Blackmon alleges a variety of adverse actions, including (1) the termination of his probationary employment, (2) being yelled at by Bugajski, (3) being subject to increased scrutiny, (4) having his workload increased, (5) being followed to court by Harney, and (6) being denied assistance and sufficient training. (IDHR Charge, Attach. to Pl.'s Am. Compl.; Def.'s 56.1(a) ¶¶ 52-56.) Of this list, the only action that qualifies as materially adverse is the termination of Plaintiff's probationary employment because it constitutes a "significant change in employment status." *Chaudhry*, 546 F.3d at 838.

The other actions are not significant enough to rise to the level of materially adverse. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("petty slights or minor annoyances" are not actionable). First, neither being yelled at by one supervisor nor being followed to court by another can fairly be characterized as materially adverse actions. *See Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (noting that being stared or yelled at by supervisors is not an actionable harm). Plaintiff's allegation that he was subject to increased scrutiny–specifically, being watched by his supervisor, O'Donnell (Def.'s 56.1(a) ¶ 53)–also does not qualify. *See Stephens*, 569 F.3d at 790. Plaintiff alleges that his workload was increased when he was required to make copies of code violation notices. (Def.'s 56.1(a) ¶ 53; Blackmon Dep. 257.) Such an action also does not rise to the level of materially adverse. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (no adverse employment action where plaintiff was given "additional work that she perceived as outside her normal job responsibilities").

Plaintiff also contends he was denied assistance and sufficient training, and the court recognizes that a "discriminatory denial of job-related training can constitute an adverse employment action under Title VII." *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003), citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998). Plaintiff here received general training at the DOB for approximately two weeks and specific training in both the demolition and STF

10

divisions for approximately two to three weeks respectively. Apart from his own suspicion, however, he offers no evidence that any other employees received more training than he did. (Def.'s 56.1(a) ¶¶ 14-15, 17, 37; O'Donnell Aff. ¶ 7.)

Plaintiff's termination unquestionably does constitute an adverse action. In this record, however, the court sees no direct or circumstantial evidence that the termination was the product of race or color discrimination–that is, no evidence "point[ing] directly to a discriminatory reason for the employer's action." *Burks*, 464 F.3d at 750 n.3, *quoting Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005). Not surprisingly, in "today's politically correct workplace environment," where admissions are rare, no supervisor offered "an admission . . . that his actions were based on the prohibited animus." *Jordan v. City of Gary*, 396 F.3d 825, 832 (7th Cir. 2005), *quoting Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000).

Nor has Plaintiff identified any circumstantial evidence of discrimination, such as "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group" or "(2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008), *quoting Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). In *Atanus*, the court considered evidence that a supervisor asked plaintiff what her nationality was and then proceeded to stay silent for the rest of the meal. *Id.* at 672 n.5. That evidence was insufficient to defeat a motion for summary judgment. *Id.* Plaintiff here has even less to offer. Plaintiff asserts that Burmistrz's comments to him in the communal work space were racially motivated, but he also admits that race was never mentioned. (Def.'s 56.1(a) ¶ 25; Blackmon Dep. at 124-25.) The reported routine of white and Hispanic building inspectors sitting separately from white and African-American inspectors is disappointing; but Plaintiff has not suggested that management directed (or even authorized) this practice. He offers no evidence of questionable conduct towards other African-American

11

employees at the DOB, nor any showing that non-African-American probationary building inspectors received better treatment. In short, Plaintiff lacks circumstantial evidence of discrimination.

### b. Indirect Method

Plaintiff's indirect method case fares no better. Under this method, Plaintiff must show: (1) he is a member of a protected class, (2) his work performance met Defendant's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside of his protected class received more favorable treatment. *Hobbs v. City of Chicago*, 573 F.3d 454, 460 (7th Cir. 2009); *Atanus*, 520 F.3d at 672-73. If a plaintiff can establish these four elements, defendant can rebut the showing by presenting evidence of a "legitimate, noninvidious reason for its actions." *Atanus*, 520 F.3d at 672. If the defendant does so, the plaintiff must carry the burden of showing that the defendant's reasons are pretextual. *Id.* Plaintiff only meets two of the four requirements to prove discrimination under the indirect method. As discussed above, Plaintiff is a member of a protected class and suffered an adverse employment action when he was terminated. (Pl.'s Am. Compl. ¶¶ 13, 37.) As Defendant argues, however, Plaintiff's work performance did not meet Defendant's expectations, and there is no evidence that similarly situated non-African-American employees were treated more favorably than he was.

To determine whether a plaintiff is meeting his employer's expectations, a court must examine the employee's job performance through the eyes of his supervisors at the time of the adverse action. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). In *Gates*, the court found that the employee was not meeting her job expectations when she used her employer's phone and Internet for personal use, and the record showed her supervisor's "increasing displeasure" with her job performance. *Id.* Similarly, Plaintiff's supervisors–O'Donnell, Bugajski, and Harney–identified various concerns regarding Plaintiff's work performance: (1) he provided substandard court testimony, (2) he had difficulty identifying porch and building violations on properties he inspected, (3) he did not complete paperwork on time, and (4) he did not handle

12

constructive criticism well. (Def.'s 56.1(a) ¶¶ 40, 42, 48.) Bugajski and Harney received specific complaints from City attorneys regarding Blackmon's inability to remember properties he had inspected while providing testimony in court. (*Id.* at ¶¶ 41, 49.) Moreover, Blackmon's supervisors believed his work performance did not show signs of improvement. (*Id.* at ¶¶ 44, 47, 49-50.) In response, Plaintiff asserts only that his performance issues were not explained to him or not documented. (Pl.'s 56.1(a) ¶¶ 13-15, 22-23, 25.) Whatever Plaintiff's subjective memory may be, the record shows that both Bugajski and O'Donnell met with Plaintiff on separate occasions to discuss his work performance issues in June and August 2008. (Def.'s 56.1(a) ¶¶ 43, 46.) Plaintiff admits these meetings took place. (Pl.'s Resp. ¶¶ 43, 46; Blackmon Aff. ¶¶ 33-34, 42.) Thus, the evidence shows that Plaintiff was not meeting Defendant's expectations at the time he was terminated because he was not performing his job adequately.

Plaintiff has not identified any similarly situated employees outside of his protected class who were treated more favorably by Defendant. To qualify as "similarly situated," Plaintiff must show that another employee "dealt with the same supervisor, was subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). As in *Atanus*, where the plaintiff's discrimination claim failed in part because she did not offer evidence that other employees were treated more favorably, *Atanus*, 520 F.3d at 672, Plaintiff here offers no evidence that any other probationary building inspector who reported to the same supervisor and exhibited similar work performance was treated more favorably than he was.

Even if the court were to conclude Plaintiff had made a showing of disparate treatment, he would be unable to establish that Defendant's proffered reason for the disparate treatment–poor job performance on a number of parameters–is a pretext for discrimination. The court concludes that Defendant has shown there are no disputes of fact on Plaintiff's claim of discrimination on the

basis of race and color, and that Defendant is entitled to judgment on this claim as a matter of law.

**2.     Retaliation**

Plaintiff also claims that Defendant retaliated against him in violation of Title VII.[6]  In response, Defendant argues that there are no facts in the record to support this claim.  Title VII prohibits an employer from retaliating against an employee because that individual opposed a practice made unlawful by Title VII.  42 U.S.C. § 2000(e)-3(a); *Burlington Northern*, 548 U.S. at 59. Plaintiff may prove his case of retaliation by either the direct or the indirect method.  *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).  The court again considers Plaintiff's claim under each method.

**a.     Direct Method**

To establish retaliation under the direct method of proof, Plaintiff must demonstrate that (1) he engaged in protected activity, (2) he suffered an adverse action by Defendant, and (3) there was a causal connection between the two events.  *Nichols*, 510 F.3d at 785.  Plaintiff has established the first two elements, but has failed to establish the third.

Plaintiff engaged in protected activity because he complained to Hopkins following the incident with Burmistrz.  An internal complaint–namely one made to an employer instead of an agency like the Equal Opportunity Employment Commission–may constitute protected activity under Title VII.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  The complaint must refer to discrimination on the basis of the victim's membership in a protected class, *Tomanovich*, 457 F.3d at 663, a test Plaintiff met in this case when he complained to Hopkins regarding the incident where Burmistrz suggested Plaintiff change seats in the communal workspace.  (Def.'s 56.1(a) ¶ 24.)  Plaintiff admits that race was not mentioned during the exchange about seating, but

---

[6]     Defendant notes that is it unclear from Plaintiff's complaint whether he is bringing a § 1981 retaliation claim, but notes that the same standard of proof for Title VII retaliation claims applies to § 1981 retaliation claims.  *Stephens*, 569 F.3d at 786.

he believed the comments were race-based because: (1) Burmistrz is white and Plaintiff is African-American, (2) the work area where Plaintiff had sat down was, according to him, primarily used by white and Hispanic inspectors, and (3) there was no reason for Burmistrz to suggest the seat change. (*Id.* at ¶ 25.) When Plaintiff complained to Hopkins, he told her, "I'm tired of this racial crap. I'm getting too old for this." (*Id.* at ¶ 29.) Blackmon's complaint to Hopkins constitutes a protected activity because it was an internal complaint alleging discrimination based on race.[7]

Plaintiff suffered an adverse action because Defendant terminated his probationary employment. For retaliation claims, a materially adverse employment action is one that would "dissuade a reasonable employee from making or supporting a claim of discrimination." *Hobbs*, 573 F.3d at 463, *quoting Burlington Northern*, 548 U.S. at 57. In *Hobbs*, the court found that an employee given "undesirable" job assignments did not suffer an adverse action because such assignments were within her job duties and there was no loss of job title or pay.[8] *Id.* As discussed above, Plaintiff has alleged a variety of materially adverse actions, but the only one that qualifies under this standard is Defendant's termination of his probationary employment. (Def.'s 56.1(a) ¶¶ 52-56.) The possibility of termination certainly could dissuade a reasonable employee from making a discrimination complaint.

Plaintiff also alleges that his lateral transfer from the demolition division to the STF division meets this test, but the court cannot agree. (*Id.* at ¶ 5.) "A purely lateral move to a new position,

---

[7] Hopkins herself testified that Plaintiff spoke to her about the incident in the communal workspace, but did not mention race. (Def.'s 56.1(a) at 10 n.3.) For the purposes of summary judgment, however, Defendant does not dispute that Plaintiff's internal complaint constitutes a protected activity. (*Id.*)

[8] The court acknowledges that a genuinely undesirable work assignment might be sufficient to support a retaliation claim. *See Nichols*, 510 F.3d at 780, *quoting O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004) (noting three categories of actionable, materially adverse employment actions, including "cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment").

a transfer that 'does not involve a demotion in form or substance,' cannot serve as an adverse employment action." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 480 (7th Cir. 2010), *quoting Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) (plaintiff's lateral move from dispatcher to data administrator was not an adverse action because it involved no loss of pay, benefits, or significant changes to working conditions). "Neither does a transfer involving no reduction in pay and no more than a minor change in working conditions qualify as an adverse employment action." *Id.* Similarly, Plaintiff's job title, salary, and benefits did not change after his transfer to the STF division. (Def.'s 56.1(a) ¶ 35.) Moreover, Plaintiff experienced no significant changes in his working conditions, as his job duties as an inspector in the demolition division and the STF division were similar. (*Id.* at ¶¶ 17, 36.)

Although Plaintiff engaged in protected activity and suffered an adverse employment action, he has not demonstrated a causal connection between his May 2008 complaint and his termination, which took place in October 2008. (Def.'s 56.1(a) ¶¶ 22, 29, 50.) A plaintiff may establish causation "by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.,* 416 F.3d 540, 545, 546 (7th Cir. 2005) (recognizing a causal connection between plaintiff's complaint and her termination just three days later). The Seventh Circuit has also made clear, however, that "[e]vidence of temporal proximity, . . . standing on its own, is insufficient to establish a causal connection for a claim of retaliation." *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). In this case, four months passed between Plaintiff's internal complaint and his termination. In *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999), the Seventh Circuit found a four-month time gap too long to suggest causation. Notably, even less time between a protected activity and adverse connection may be insufficient. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven week interval between complaint and termination did not, by itself, establish causation).

Nor is there any evidence of sudden dissatisfaction with Plaintiff's work performance

following his protected activity, as in *Culver*, 416 F.3d at 546, where plaintiff's termination, swiftly on the heels of her complaint, followed a positive performance evaluation. Plaintiff Blackmon's supervisors were concerned about Plaintiff's performance for several months before his termination. (Def.'s 56.1(a) ¶¶ 40-49.)

Most important, there is no evidence that Plaintiff's supervisors were aware that Plaintiff had made an internal complaint. The Seventh Circuit has noted: "[A] superior cannot retaliate against an employee for a protected activity about which he has no knowledge." *Stephens*, 569 F.3d at 788. Only Harney knew about Plaintiff's complaint; neither of Plaintiff's immediate supervisors–Bugajski and O'Donnell–had any knowledge of his complaint. (Def.'s 56.1(a) ¶ 31.)

Because Plaintiff has not established a causal connection between his internal complaint and his termination, his retaliation claim does not succeed under the direct method of proof

### b. Indirect Method

Plaintiff's indirect method case of retaliation fails for much of the same reason his race discrimination claim was unsuccessful: he has offered no evidence that a similarly situated worker who did not voice complaints was treated more favorably. To proceed under the indirect method, Plaintiff must show that (1) he engaged in a protected activity, (2) he met Defendant's legitimate expectations, (3) he suffered an adverse employment action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity. *Nichols*, 510 F.3d at 785. Plaintiff engaged in a protected activity by making an internal complaint and suffered an adverse action when he was terminated. (Def.'s 56.1(a) ¶¶ 29, 50.) He has not identified any similarly situated employees who were treated more favorably, however. (*Id.* at ¶ 40-42.) And, because there is no evidence that the decision makers were aware of his internal complaint, any showing that they treated other workers more favorably could not suggest retaliation.

The court concludes that Defendant has shown there are no disputes of fact on Plaintiff's claim of retaliation, and that Defendant is entitled to judgment on this claim as a matter of law.

**B.      § 1981**

Plaintiff' has asserted claims of race discrimination and retaliation under 42 U.S.C. § 1981, in addition to Title VII. The same requirements for proving discrimination apply to race discrimination and retaliation claims, regardless which statute Plaintiff invokes. *Egonmwan v. Cook County Sheriff's Dept.,* 602 F.3d 845, 850 n. 7 (7th Cir. 2010) (citing cases). Because the court concludes those claims fail on the merits, it need not address § 1981 at any length. Defendant is correct, however, that the City itself could be held liable for discrimination in violation of § 1981 only if Plaintiff could establish that discrimination was part of a widespread practice or policy, or that discriminatory decisions were made by someone with final policymaking authority for the City. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 736-37 (1989) (applying to suits under § 1981 the principles for municipal liability in § 1983 litigation established by *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).) Plaintiff has not proven that Defendant has a widespread practice of discrimination. His only evidence of any policy or practice claim consists of hearsay statements from co-workers: (1) an African-American building inspector told him he would not learn as much in the demolition division as in the conservation division, (2) an unnamed "Arab" man once told him "something on the lines of minorities being around or in that department or something on those lines and not being there very long or something," and (3) following Blackmon's complaint to Shirley Seymore in the personnel division, Seymore made a comment to Blackmon referring to his supervisors as "bad boys." (Def.'s 56.1(a) ¶¶ 58-60.)[9] In contrast, Seymore and Hopkins, who are

---

[9]      Defendant asks the court to strike Plaintiff's affidavit, as well as many of Plaintiff's additional facts, fact responses, and exhibits from the record because they do not comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1(b). (Def. City of Chicago's Reply Mem. in Further Supp. of its Mot. for Summ. J. (hereinafter "Def.'s Reply"), at 2-3, 6.) Specifically, Defendant argues that Plaintiff's submissions contain: (1) vague, argumentative, or conclusory assertions, (2) speculation, (3) inadmissible hearsay, or (4) statements lacking foundation. (*Id.* at 3-5.) *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("a court may consider only admissible evidence in assessing a motion for summary judgment"). In light of the court's resolution of this case, Defendant's objection to Plaintiff's submissions is moot.

(continued...)

both African-American and have worked at the DOB for 39 and three years respectively, testified that they have never experienced racial discrimination during their employment. (*Id.* at ¶ 62; Seymore Dep. 28:8-22; Hopkins Dep. 39:16-24.) Disconnected hearsay statements do not establish a practice of discrimination sufficient to trigger municipal liability under § 1981.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [61] is granted and Plaintiff's Complaint is dismissed with prejudice.

ENTER:

Dated: July 20, 2011

_____
REBECCA R. PALLMEYER
United States District Judge

---

[9](...continued)